IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DONALD C. BONWICK, | CASE NO. 4:24-cv-294 |
| Plaintiff, | DISTRICT JUDGE DAVID A. RUIZ |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Donald C. Bonwick filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits and supplemental security income. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural Background**

In October 2021, Bonwick filed applications for both disability insurance benefits and social security income, alleging a disability onset date in October 2019.[1] Tr. 262, 269. Bonwick alleged disability relating to depression, ADHD, learning disability, snapping hip syndrome,[2] bursitis,[3] lumbar[4] disc

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

[2] Snapping hip syndrome, the common name for the medical condition "coxa saltans," is a hip disorder that causes a snapping feeling or sound when individuals move their hip joint. It may cause inflammation and, in serious conditions, can cause pain and affect movement. *Snapping Hip Syndrome, What is snapping hip syndrome?*. Healthline, Health Conditions, https://www.healthline.com/health/snapping-hip-syndrome [**https://perma.cc/7DMS-J4NX**].

[3] Bursitis is a condition that affects the cushioning around bones, tendons, and muscles near joints. It occurs when the bursae, the small fluid-filled sacs that provide cushioning, become inflamed. With proper treatment, bursitis pain can resolve within a few weeks, but it may recur or flare-up. *Bursitis, Diseases & Conditions*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/bursitis/symptoms-causes/syc-20353242 [**https://perma.cc/E9ZN-XGPB**].

[4] Vertebrae in a person's spine are given letter and number designations according to their location. The neck—the cervical spine—has seven vertebrae designated as C1 through C7. *See* Thomas Scioscia, MD, Vertebrae in the Vertebral Column, Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column [**https://perma.cc/R9MM-TBZT**]. The twelve vertebrae compromising the upper spine—the thoracic spine—are labeled at T1 through T12. *Id*. The five vertebrae in the lower spine—the lumbar spine—are L1 through L5. *Id*. The five vertebrae at the bottom of the spine—in the sacrum—are labeled as S1 through S5. Thomas Scioscia, MD, Sacrum (Sacral Region), Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/sacrum-sacral-region [**https://perma.cc/S2BR-RBTB**]. Conditions referring to lumbar or sacral, refer to conditions affecting these areas of the spine.

degeneration, lumbar sacral neuritis,[5] lumbosacral spondylosis,[6] and lumbago.[7] Tr. 89, 100. The Commissioner denied Bonwick's application initially and on reconsideration. Tr. 112, 122.

In April 2022, Bonwick requested a hearing. Tr. 170. Administrative Law Judge ("ALJ") Mary Lohr held a telephonic hearing in February 2023. Tr. 38. Bonwick appeared, testified, and was represented by counsel at the hearing. *Id.* Qualified vocational expert Gail Klier also testified. Tr. 58. In April 2023, the ALJ issued a written decision, which found that Bonwick was not entitled to benefits. Tr. 14.

In May 2023, Bonwick appealed the ALJ's decision to the Appeals Counsel. Tr. 233. In December 2023, the Appeals Counsel denied Bonwick's appeal, Tr. 1, making the ALJ's April 2023 decision the final decision of the Commissioner, Tr. 14–37; *see* 20 C.F.R. § 404.981.

---

[5] Neuritis, or neuropathic pain, is a nerve pain that occurs from a malfunction in or damage to the nervous system. It can be caused by a number of other conditions, including diabetes and spinal nerve compression or inflammation. *See Neuropathic Pain*, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/diseases/15833-neuropathic-pain [**https://perma.cc/K2NX-ETPB**].

[6] Spondylolysis is the medical term for a small crack or break between two vertebrae in the spine. It most commonly affects the lower, or lumbar, spinal region. *Spondylolysis*, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/diseases/10303-spondylolysis [**https://perma.cc/DW7M-JUUY**].

[7] Lumbago is a nonmedical term for any pain in the lower back. *See* Dorland's Illustrated Medical Dictionary 1062 (33rd ed. 2020).

**Evidence**[8]

1.   *Age, Education, and Vocational History*

Bonwick was 37 years old on the alleged onset date. Tr. 89. He has at least a high school education. Tr. 30, 45. Bonwick has reported past work as a general laborer, store laborer, maintenance carpenter. Tr. 29–30.

2.   *Medical Evidence*

Since at least September 2019, Bonwick has received mental health treatment primarily at the Serenity Center of Youngstown. *See* Tr. 360–465; 808–878; 883-–902; 907–998. In September 2019, at an initial appointment with Francine McDaniel, FNP-C,[9] Bonwick reported that he sought services because he needed a new provider and had been taken off of his medications "cold turkey." Tr. 432. Bonwick reported anxiety and difficulty focusing at work but he stated that his most recent medication regimen was effective. *Id.* He described some depression and generalized anxiety that occurred a few times

---

[8]   The recitation of evidence and testimony is not intended to be exhaustive and is generally limited to that cited in the parties' briefs. Because Bonwick has not included any summary of the medical evidence, or otherwise provided record citations beyond the ALJ's decision and hearing testimony, the Court has generally limited its recitation of medical evidence to the evidence cited in the Commissioner's briefing.

[9]   The initials FNP-C refers to a Family Nurse Practitioner certified by the American Academy of Nurse Practitioners. *FNP-C vs FNP-BC: Which Family Nurse Practitioner Certification Do I Need?*, Nurse. Org., https://nurse.org/education/fnpc-vs-fnpbc/#:~:text=FNP-C%20is%20a%20medical%20abbreviation%20for%20the%20Family,all%20eligibility%20requirements%20and%20pass%20a%20competency-based%20exam. **[https://perma.cc/5BJQ-93P6].**

per month. Tr. 433–34. Bonwick also reported attention difficulties, including periods of "zoning out" and trouble listening when spoken to directly. Tr. 434. Nurse Practitioner McDaniel reported that Bonwick presented as calm, friendly, attentive, communicative, and relaxed. Tr. 437. She noted that his speech was normal, his language skills were intact, and his mood and affect were normal. Tr. 437. She also wrote that Bonwick's short-term memory was also intact and there were no signs of hyperactive or attention difficulties. Tr. 437. Nurse Practitioner McDaniel diagnosed Bonwick with generalized anxiety disorder, dysthymic disorder, and ADHD. Tr. 437. She prescribed Effexor for anxiety, Adderall for ADHD, and Trazadone for insomnia. Tr. 438.

One week later, Bonwick denied anxiety or ADHD symptoms, reported that he was happy with his medication and that he was doing well. Tr. 439. He also appeared calm, friendly, attentive, communicative, and relaxed. Tr. 439. His mood was normal with no signs of depression and his memory was intact. Tr. 439. There were no reported signs of anxiety at this appointment. Tr. 439.

During later visits to Serenity Center from late 2019 through January 2021, Bonwick sometimes reported or exhibited difficulties with attention or remaining focused. *See* Tr. 404, 442. At other times, he denied inattentiveness or ADHD symptoms. *See* Tr. 384, 394, 427. On several occasions, Bonwick exhibited a normal attention span, no signs of attention difficulties or hyperactivity, and denied inattentive symptoms. Tr. 362, 380, 384, 390, 394,

5

414, 427, 452, 457. He also frequently exhibited a euthymic mood,[10] intact memory, logical thinking, or normal articulation and speech. *See, e.g.*, Tr. 367, 374, 380, 384, 390, 395, 399, 409, 413, 427, 452, 456, 457.

In July 2020, Bonwick sought emergency treatment for a left ankle injury after twisting it at a water park. Tr. 505.

From February 2021 through November 2021, Bonwick continued to report in appointments at the Serenity Center that his medications were working well and that he wished to continue them. Tr. 808, 815, 854, 868, 872. Sometimes, Bonwick reported or displayed anxiety or attention difficulties and did not seem to listen when spoken to. Tr. 839, 843, 844, 855. But at other times, he denied or did not display anxiety, depression, or inattentiveness. Tr. 809, 815, 816, 823. Bonwick also often exhibited appropriate behavior, normal attention span, intact memory, logical thinking, normal insight and social judgment, appropriate affect, or a euthymic mood. *See, e.g.*, Tr. 809, 816, 823, 829, 833, 834, 839, 850, 860, 866, 873.

Bonwick continued to be treated at Serenity Center between December 2021 and February 2022. Tr. 883–902. During this time, Bonwick continued to report anxiety or depression but he also expressed that his medications worked well. Tr. 883, 890, 891, 897. Bonwick also displayed intact memory, normal attention, normal social judgment, and a euthymic mood. Tr. 884, 891, 898.

---

10  A euthymic [mood/affect] is tranquil, neither depressed nor manic. *See* Dorland's Illustrated Medical Dictionary 647 (33rd ed. 2020).

In a March 2022 examination at the Serenity Center, Bonwick stated that he was "doing good," although he continued to experience anxiety and depression symptoms. Tr. 907. And in an April 2022 examination, he asserted that his medications were working well, denied any side effects, and expressed that he wished to continue on his current medications. Tr. 913. In June and July 2022, Bonwick stated, respectively, that his depression and anxiety were manageable, Tr. 935, and that his ADHD symptoms were well controlled with Adderall, Tr. 975. At an October 2022 appointment at the Serenety Center, Bonwick remarked that his symptoms were management and that he worked at the "Scare Grounds" for Halloween and was enjoyed it. Tr. 953.

3. *State Agency Consultants*

In December 2021, state agency psychological consultant, Courtney Zeune, Psy.D, found that Bonwick could perform short cycle work tasks in a setting with flexible pace and production requirements. Tr. 108. Dr. Zeune also found that Bonwick was not significantly limited or had no evidence of limitation in various areas of social interaction. Tr. 108. In March 2022, state agency psychological consultant on reconsideration, Kristen Haskins, Psy.D, generally agreed with Dr. Zeune's determinations but slightly modified her findings to include that Bonwick could perform short cycle work tasks in a setting with no fast-paced demand. Tr. 118–19.

7

*4. Hearing Testimony*

Bonwick testified that he lived with his twin sister, her family, and his parents. Tr. 44. He stated that he had a driver's license but did not drive often as it caused him pain. Tr. 45. Bonwick testified that he graduated high school. Tr. 45. He described that he stopped working in October 2019 when pain in his hip and groin worsened and prevented him from being able to "do [his job] at 100 percent." Tr. 52. Bonwick stated that he was recommended for hip replacement surgery but has to lose weight first, because doctors could not perform the surgery on a person with a BMI above 40. Tr. 53. Bonwick testified that he would not be able to perform seated work because it also hurt his hip and that his alternatives to sitting or standing include lying down in bed or in a recliner with his legs up. Tr. 54. He said that he cannot put weight on his right leg and has fallen over when he has done so. Tr. 54. Bonwick also testified that he took the medication Effexor as prescribed for his anxiety and that he participated in telehealth counseling. Tr. 55.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act (the "Act") through December 31, 2024. This finding departs from that of the previous decision, a reflection of the claimant's acquiring additional "quarters of coverage" from work activity.

2. The claimant has not engaged in substantial gainful activity since October 1, 2019, the

8

        alleged onset date (20 CFR 404.1571 *et seq.*, 416.971 *et seq.*). Except that this finding reflects the alleged onset date for the present claim, it adheres to that of the previous decision.

3. The claimant has the following severe impairments: obesity, degenerative disc disease of the lumbar spine, status-post facture of the left ankle, degenerative joint disease/arthritis of the hip, dysthymic disorder, generalized anxiety disorder, attention deficit-hyperactivity disorder, and insomnia, unspecified. (20 CFR 404.1520(c) and 416.920(c)). This finding departs from that of the previous decision, in order to reflect severe impairments documented in the current evidence.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). This finding adheres to that of the previous decision.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual function capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant may stand and/or walk, with normal breaks, for up to four hours in an eight-hour workday; the claimant may frequently balance, may occasionally stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes, or scaffolds; the claimant must avoid all exposure to unprotected heights and moving mechanical parts; the claimant is limited to the performance of simple, routine, repetitive tasks, conducted in a setting free of

9

        production-rate pace [as is found in assembly line work]. This finding departs from that of the previous decision, in order to accommodate the present state of the impairments documented in the current evidence.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965). This finding adheres to that of the previous decision, including consideration of the job of maintenance carpenter, identified as past relevant work since the previous decision.

7. The claimant was born on May 31, 1982 and was 37 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963). This finding departs from that of the previous decision, owing to the claimant's attainment of greater chronological age.

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964). This finding adheres to that of the previous decision.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disable," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2). This finding departs from that of the previous decision, in order to establish the appropriate grounds for the finding for a claimant with semi-skilled or skilled work.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy

    that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.696, and 416.969a). This finding adheres to that of the previous decision.

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)). Except that this finding recites the alleged onset date for the present claim, it adheres to that of the previous decision.

Tr. 20–31 .

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

 An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

11

> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.
>
> 5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."

*Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

13

**Discussion**

As an initial matter, before proceeding to the substance of Bonwick's argument, the Court notes that Bonwick's brief contains no citation to the medical record, and only a very brief summary of Bonwick's vocational history, level of educational, and testimony. See Doc. 8, at 1–9. The Court's initial order states: "All facts relevant to the legal issues and discussion must be set forth in the Facts section." Doc. 5, at 3. Bonwick even recognizes that "[i]n order to determine an RFC, the adjudicator is instructed to base the assessment on 'all of the relevant medical and other evidence.' 20 C.F.R. §§ 404.45(a)(3), 416.945(a)(3)." Doc. 8, at 5. Yet, Bonwick's brief contains no citation to the record of medical evidence, instead opting to cite only the ALJ's written decision and Bonwick's hearing testimony. So, Bonwick is not off to a strong start.

Proceeding to the substance of Bonwick's single issue presented, it is meritless. For starters, as stated above, Bonwick has not cited to any medical evidence that the ALJ allegedly failed to consider in crafting Bonwick's RFC. *See generally* Doc. 8. This is problematic because the questions before the Court are whether the ALJ complied with applicable regulations and whether the ALJ's decision was supported by substantial evidence. *See Bass*, 499 F.3d at 509. So without citation to the record to show that the ALJ's failed to consider certain evidence or symptoms, the Court is left only with Bonwick's opinion. Additionally, Bonwick has not clearly alleged that the ALJ failed to comply

14

with any particular regulation. *See* Doc. 8, at 5–7. Instead, Bonwick generally cites regulations describing the process to reach an RFC determination, admits that the RFC does include some limitations, and claims generally that the limitations included were insufficient. Doc. 8, at 5–7.

Bonwick admits that the RFC did include "some mental limitations," but he "argues that the RFC is not sufficient to accommodate each of Plaintiff's impaired functional abilities." Doc. 8, at 6. Specifically, Bonwick baldly claims that the RFC limitations included "do not reflect a limitation which corresponds to his reduced ability to adapt and manage." Doc. 8, at 7. But Bonwick omits any mention of evidence to support the idea that he has "impaired functional abilities." Indeed, other than citing the ALJ's decision, Bonwick offers no record basis to conclude that he has any impairments at all. So without more, his argument is simply an expression of Bonwick's opinion that the ALJ should have provided greater limitations. And, as the Commissioner notes, despite Bonwick's assertion that greater limitations should have been included, he does not make any argument as to what those limitations should have been. *See* Doc. 10, at 13. This sort of argument does not provide the Court with any basis for remand.

Bonwick makes two additional arguments, neither of which are clearly related to his sole captioned argument that the ALJ failed to properly consider each of his mental impairments in crafting his RFC. Doc. 8, at 4. First, Bonwick

15

cites the DOT[11] sections for each job the vocational expert opined a hypothetical individual with Bonwick's RFC could perform. Doc. 8, at 7–8. He then asks the Court to conclude that "those jobs would clearly cause an individual who decompensates under stressors to struggle with job performance." Doc. 8, at 7–8. This argument is both confusing and unavailing.

As best as the Court can discern, Bonwick is arguing that the jobs the vocational expert opined an individual with his RFC could perform are not jobs that *he* could actually perform. Bonwick, however, does not directly challenge the vocational expert's testimony and he cites nothing in the record—whether medical evidence or otherwise—for his opinions that he could not perform those jobs. Bonwick also does not cite any legal authority to show that the vocational expert or ALJ erred by concluding that these jobs were available to Bonwick. And because Bonwick's single argument heading includes no indication that he challenges the vocational expert's testimony, the Court need not consider it.[12]

Second, and finally, Bonwick cites training material from a continuing education program entitled "Four Keys to B Criteria," Doc. 8, at 8–9, in support

---

[11] DOT stands for the Dictionary of Occupational Titles. It is a standard classification of occupations established by the Social Security Administration. The DOT includes descriptions of the physical demands, environmental factors, and skill levels for various occupations.

[12] The Court's Initial Order provides that "[e]ach introductory heading in the Argument or Analysis section of a brief must correspond to the argument presented under the heading. Failure to comply with this Requirement may result in … waiver of the arguments[.]" Doc. 5, at 3–4.

16

of his apparent argument that the ALJ did not adequately explain the RFC determination. As an initial matter, this material does not represent controlling legal authority and Bonwick does not claim otherwise. Additionally, this argument is confusing because Bonwick does not assert that the ALJ erred when considering each of the four paragraph B criteria,[13] and review of the ALJ's decision would contradict any such argument. *See* Tr. 21–22. In fact, Bonwick admits that the ALJ need not specifically include limitations based on each paragraph B criteria into a final RFC determination. *See* Doc. 8, at 5 (citing *Shinlever v. Berryhill*, No. 3:15-cv-371-CCS, 2017 WL 2937607, at *46 (E.D. Tenn. Jul. 10, 2017) and recognizing that "an ALJ is not necessarily required to include mental limitations in Plaintiff's RFC solely because she found mild limitations in the paragraph B criteria for Step Two"). Despite this recognition, Bonwick asks the Court to find that the ALJ committed reversable error by failing to explain why certain paragraph B limitations were not included in the final RFC determination. Doc. 8, at 8–9.

This argument is flawed. Bonwick admits both that there is no requirement that Paragraph B limitations be included and that some mental limitations were included in his RFC. *See* Doc. 8, at, 6, 8–9. Additionally,

---

[13] To meet or equal paragraph B, an individual's mental disorder must result in an extreme limitation of one, or a marked limitation of two, of the four areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(A)(2)(b).

Bonwick citations nothing to substantiate his assertion the RFC was not supported by substantial evidence. So he's forfeited the argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (internal citations omitted). Bonwick's final argument is, thus, contradicted by his earlier arguments and otherwise provides no basis for remand.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: August 23, 2024

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th